# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | Docket No. 1:17-cr-00171-NT |
| ) | |
| RYAN MUMME, ) | |
| ) | |
| Defendant. ) | |

## ORDER ON DEFENDANT'S MOTION TO SUPPRESS

Defendant Ryan Mumme is charged with possession of child pornography in violation of 18 U.S.C. §§ 2252A(a)(2), 2252A(a)(5)(b), and 2256(8)(a). Before me is Mr. Mumme's motion to suppress statements that he made and evidence that was seized during an August 31, 2015, police interview at Mr. Mumme's home. (ECF No. 29.) I held a hearing on Mr. Mumme's motion on May 22, 2018. For the reasons set out below, I **DENY** the motion to suppress.

## FINDINGS OF FACT[1]

The Government began investigating Mr. Mumme after obtaining electronic payment records that showed that on December 17, 2011, a "Ryan Mumme" with the email address "dexter.rick@yahoo.com" had made a $ 30 unspecified purchase from a person located in the Philippines accused of producing child pornography. Gov't's Ex. 3 at 3 (ECF No. 34-4). Further investigation suggested that between November 19, 2010, and March 24, 2015, a "Ryan Mumme" had repeatedly wired money to accounts

---

[1] The facts set out below are drawn from the testimony of Detective Christopher Tupper of the Maine State Police, Homeland Security Investigations Special Agent Gregory Kelly, and Homeland Security Investigations Special Agent Chase Ossinger and from the exhibits offered by the parties.

in the Philippines and Russia in amounts totaling roughly $ 16,000, in all but one instance using the email address "dexter.rick@yahoo.com." Gov't's Ex. 3 at 3.

On August 31, 2015, three officers went to interview Mr. Mumme at his residence in Eastport, Maine: Detective Christopher Tupper of the Maine State Police, Homeland Security Investigations Special Agent Gregory Kelly, and Homeland Security Investigations Special Agent Chase Ossinger. The officers were accompanied by Chris Hull, a civilian computer forensics analyst with the Maine State Police, who remained with the officers' vehicles and did not take part in any questioning. Det. Tupper wore a recording device that he left on throughout the ensuing encounter. Gov't's Ex. 1 (ECF No. 34-1).

Mr. Mumme's residence is located at the corner of a paved street and a dirt road. The officers and Mr. Hull arrived in two unmarked cars and parked along the side of the dirt road near a recreational vehicle (**"RV"**) that was situated next to Mr. Mumme's house. Det. Tupper went to the door of the house and knocked twice, but there was no response. Mr. Mumme's father, Chris Mumme ("**CM**"), then approached the officers from the direction of the RV. CM identified himself as a former law enforcement officer and attempted to get the officers to leave without speaking to Mr. Mumme. He also told the officers that he owned the property.

While the officers were speaking with CM, Mr. Mumme drove past them up the dirt road and parked his car roughly 20 yards away in a grass lot behind the house. Det. Tupper informed CM that the officers wanted to speak with Mr. Mumme because they had information that Mr. Mumme was involved in the purchase of child

2

pornography. CM offered to speak with his son and to contact the officers later. Det. Tupper said that the officers had driven from Bangor to meet with Mr. Mumme and that Det. Tupper was going to go speak with him. Det. Tupper walked around CM to get to Mr. Mumme, yelling "don't hinder!" at CM over his shoulder. Gov't's Ex. 2 at 6 (ECF No. 34-2). The two Homeland Security agents remained with CM. At some point, CM asked the agents if they knew that they needed a search warrant to be where they were standing. Agent Kelly replied that they were standing on a public road and that the agents had as much right to be there as a meter reader. None of the officers touched CM at any point, nor did they raise their voices to him or otherwise attempt to intimidate him.

As is reflected in the recording, Det. Tupper informed Mr. Mumme at the outset of their conversation that he had evidence that Mr. Mumme had sent money to the Philippines to a person who trafficked in live sex shows involving children. Mr. Mumme admitted to having paid for live sex videos, but he denied purchasing child pornography. When asked whether he had ever received any child pornography, Mr. Mumme responded that he had seen it online. Mr. Mumme stated that a pornographic image involving a child had popped up on his computer sometime in the last two months. He said that it depicted a 13-year-old girl who he believed was performing oral sex on an older man, although he added that the image was pixelated. Agent Kelly then joined the conversation. Mr. Mumme went on to admit to using the email "yahoo, dexter rick" and to sending money to a woman in the Philippines once a month. He also confirmed that the property belonged to CM, and he added that Mr.

Mumme was the only full-time resident as his parents lived in Florida. Neither Det. Tupper nor Agent Kelly ever informed Mr. Mumme that he was free to leave.

While Det. Tupper and Agent Kelly spoke with Mr. Mumme, CM remained near Agent Ossinger. CM left Agent Ossinger to go in and out of the RV several times and never attempted to call out to Mr. Mumme or to go and speak with him.

Det. Tupper and Agent Kelly asked Mr. Mumme if they could search his computers. Mr. Mumme declined, stating that he did not want his privacy invaded. Det. Tupper told Mr. Mumme that because he had declined the search, the officers could not search the computers without a warrant. He then told Mr. Mumme that he had two options: Either the officers would secure Mr. Mumme's house while Det. Tupper applied for a search warrant, or Mr. Mumme could consent to turn over his electronic devices to the officers and they would hold those devices until their warrant application had been approved or denied. As Det. Tupper explained:

> I have to um go see a judge, is what it entails. . . . or you could turn over your computer and I still have to go see a judge but I go see that judge tomorrow and not today. And I don't go thr[ough] your entire house. But either way I can't look at that computer without a warrant so it all depends on how you, how you want me to actually take physical possession of the device. . . . If you want to turn your device over I can apply for a search warrant if I don't get it, I bring it back to you untouched. Or I can get somebody to keep anybody from going in the house, and go see a judge right now, it's your call.

Gov't's Ex. 2 at 14.

Det. Tupper told Mr. Mumme that he now knew that Mr. Mumme had "child pornography even if it's one image," and that "if it's one image that's pixilated I'm not overly concerned with that and I don't even know if that's chargeable." Gov't's Ex. 2 at 14. Det. Tupper also reiterated that the officers knew that Mr. Mumme had sent

4

"an awful lot of money" to the Philippines, including to a person who trafficked in live pornographic videos of children. Gov't's Ex. 2 at 14. Mr. Mumme responded, "I should get a lawyer at this point," and Det. Tupper told Mr. Mumme that was up to him. Gov't's Ex. 2 at 14-15. Mr. Mumme repeated, "I think I'll have to contact a lawyer," and Det. Tupper responded, "ok, so I'm securing your house today?" Mr. Mumme replied, "I guess you're gonna have to." Gov't's Ex. 2 at 15. Mr. Mumme asked if he could go into the house make a phone call, and Det. Tupper told him that he could not. Det. Tupper then said that he was going to go make arrangements to have more officers come to the house, at which point Mr. Mumme said, "you know what never mind," and he allowed the officers into the residence to collect his electronic devices. Gov't's Ex. 2 at 15.

As they were gathering the devices from inside the house, Det. Tupper again told Mr. Mumme that if the officers' search warrant application was rejected, Mr. Mumme would receive the devices back untouched. Det. Tupper added that if the warrant was granted and if there was child pornography on the devices, he would give Mr. Mumme an opportunity to explain it.

The officers and Mr. Mumme went back outside to the officers' vehicles so that Det. Tupper could provide Mr. Mumme with paperwork memorializing his consent to the seizure of his devices. Det. Tupper informed Mr. Mumme of his Fifth Amendment rights. Det. Tupper stated that he was not going to arrest Mr. Mumme that day. He then went on to say that if Mr. Mumme wanted to clarify or explain something, he would listen, and added that he "didn't mean to scare you but um at the end of the

5

day those devices will speak for themselves." Gov't Ex. 2 at 17. Shortly thereafter, Mr. Mumme offered that there were child pornography videos stored on his computer. Det. Tupper included this confession in his application for a warrant to search Mr. Mumme's electronic devices, which was granted by the Maine District Court.

## DISCUSSION

Mr. Mumme argues that the officers: (1) coerced him into consenting to the Government's seizure of his computer; (2) engaged in an unconstitutional search by remaining on the property to speak with Mr. Mumme after CM said they needed a warrant to be there; and (3) subjected him to custodial interrogation without informing him of his Fifth Amendment rights.

### I.  Voluntary Consent

I begin by considering Mr. Mumme's claim that he was coerced into consenting to the seizure of his electronic devices and that the evidence on those devices must therefore be suppressed. The Fourth Amendment protects against unreasonable searches and seizures. U.S. Const. amend. IV. Warrantless seizures of property do not contravene the Fourth Amendment if the owner of that property consents to the seizure. *United States v. Perez-Montanez*, 202 F.3d 434, 438 (1st Cir. 2000). Consent is valid for this purpose only if it "was in fact voluntarily given, and not the result of duress or coercion, express or implied." *Schenckloth v. Bustamonte*, 412 U.S. 218, 248 (1973). The Government bears the burden of showing by a preponderance of the evidence that consent was voluntary. *Perrez-Montanez*, 202 F.3d 438.

Courts assess voluntariness by evaluating the totality of the circumstances. *Id.* Relevant considerations include the consenting party's "age, education, experience,

6

knowledge of the right to withhold consent, and evidence of coercive tactics." *United States v. Hinkley*, 803 F.3d 85, 91 (1st Cir. 2015) (quoting *United States v. Marshall*, 348 F.3d 281, 286 (1st Cir. 2003)). The consenting party's "possibly vulnerable subjective state" is also relevant, *United States v. Twomey*, 884 F.2d 46, 51 (1st Cir. 1989), as is "whether the consenting party was advised of his or her constitutional rights." *United States v. Bach*, No. CRIM. 08-79-P-H, 2008 WL 4056165, at *6 (D. Me. Aug. 25, 2008), *aff'd*, 388 F. App'x 2 (1st Cir. 2010).

"When a law enforcement officer claims authority to search a home under a warrant he announces in effect that the occupant has no right to resist the search. The situation is instinct with coercion—albeit colorably lawful coercion. Where there is coercion there cannot be consent." *See Bumper v. North Carolina*, 391 U.S. 543, 550 & n.15 (1968) (finding consent involuntary because officers asserted that they had a warrant but no warrant was ever returned). This does not, however, mean that a threat to obtain a warrant necessarily vitiates consent. *Twomey*, 884 F.2d at 51 (declining to adopt a rule under which an agent's statement that she would seek a warrant sufficed to show that consent was involuntary). "[T]he law rejects consent secured by knowingly false representations while at the same time seeing no reason to deter officers from securing convenient and prompt consensual access by conveying accurate information to a recipient." *United States v. Vazquez*, 724 F.3d 15, 22 (1st Cir. 2013).

Accordingly, whether a threat to obtain a warrant is considered coercive turns on whether the officer believed a warrant would issue "based on a reasonable

7

assessment of the facts under the applicable law." *Id.* at 19; *see also Marshall*, 348 F.3d at 285-86 (statement that officers would get a warrant was not coercive because "[p]robable cause had been established and the officers had a good faith belief that a warrant would issue"). Courts have also generally declined to find that an officer's stated intention to *seek* a warrant is coercive. *See, e.g., Twomey*, 884 F.2d at 51-52 (officers' statements that they "did not in fact have a search warrant and could be required to obtain one" weighed against a finding of coercion); *Perez-Montanez*, 202 F.3d at 438-39 ("Nor is there anything false or unduly coercive about a statement of an intention to seek other means to obtain access to property."); *United States v. Davis*, 638 F. Supp. 472, 479 (D. Mass. 1986) ("It has been held that a good faith assertion by a police officer that he would seek a warrant if the suspect did not consent to a search did not make the suspect's subsequent consent involuntary.").

Here, Mr. Mumme argues that Det. Tupper lacked probable cause to get a warrant, so his assertions that he would seek a search warrant were coercive. This argument has two flaws. First, the officers never told Mr. Mumme that they would, with any certainty, obtain a warrant. Rather, Det. Tupper stated more than once that a judge could reject his warrant application, in which case Mr. Mumme's devices would be returned to him untouched. Det. Tupper's purported threats therefore lacked the potentially coercive force of a representation that he had a warrant in hand or could definitely secure one. *Twomey*, 884 F.2d at 51-52. Second, Det. Tupper did have a reasonable belief that a warrant would issue. Det. Tupper first suggested that he would seek a warrant only after Mr. Mumme admitted that he had viewed an

8

image of child pornography on his computer "within the past month or two." Det. Tupper could reasonably assume that the image, when taken together with the evidence of Mr. Mumme's unusual history of payments to the Philippines, including one to a suspected producer of child pornography, constituted probable cause sufficient to obtain a warrant to search Mr. Mumme's computer.[2] *See Vazquez*, 724 F.3d at 19. For these reasons, I do not consider Det. Tupper's statements coercive.[3]

Mr. Mumme also argues that other aspects of his questioning indicate coercion, including that (1) Mr. Mumme had never previously been arrested and was unfamiliar with interrogation tactics; (2) the officers did not inform Mr. Mumme of his *Miranda* rights before he consented to the seizure; (3) the officers prevented Mr. Mumme's father from going to speak with him; (4) the officers did not allow Mr. Mumme to enter his home to call a lawyer and did not offer an alternative means for Mr. Mumme to make that call; and (5) Mr. Mumme told the officers during the interrogation that he felt "scared." Mr. Mumme asserts that he consented to the seizure only after being worn down by these circumstances.

---

[2] Mr. Mumme argues that Det. Tupper could not be certain that the pop-up image was retrievable off of Mr. Mumme's computer. The question here, however, is whether Det. Tupper made a reasonable determination that there was probable cause to believe that evidence of a crime would be found on Mr. Mumme's computer. I find Det. Tupper's assumption that the image remained on Mr. Mumme's computer to be reasonable.

[3] For similar reasons, I do not consider coercive Det. Tupper's statements that, if Mr. Mumme did not consent to the seizure, the officers would "camp out" in Mr. Mumme's driveway and that they would secure his house. Again, Det. Tupper reasonably believed that he would be able to obtain a warrant for Mr. Mumme's computer. In turn, Det. Tupper reasonably determined that if Mr. Mumme did not consent to the seizure it would be necessary to secure Mr. Mumme's home in order to preserve evidence. While Mr. Mumme may have felt that he was between a rock and a hard place—consent to seizure, or wait outside for the officers to secure a search warrant—the fact remains that he had a choice between those two lawful options. *See United States v. Miller*, 589 F.2d 1117, 1132 (1st Cir. 1978) ("Bowing to events, even if one is not happy about them, is not the same thing as being coerced.").

9

Mr. Mumme's characterization of the events is undercut by the evidence in the record. As the Government argued, Mr. Mumme, whose father had been involved in law enforcement, is a 46-year-old man who evidenced his awareness that he could refuse to consent to the officers' requests by doing so at least once. None of these facts suggest a person who was unaware of his rights or readily cowed by the agents. Nor was the interrogation clearly coercive. Mr. Mumme was questioned in a conversational fashion in his own backyard by two officers in civilian clothes who did not touch or menace him in any way. And although Det. Tupper twice suggested that Mr. Mumme appeared "scared," the recording of the events gives no indication that Mr. Mumme was overwhelmed or otherwise incapable of offering valid consent at the time that he consented.

Nor does the evidence support Mr. Mumme's suggestion that he felt compelled to consent because he saw officers restraining his father. With the exception of Det. Tupper's directive to CM ("don't hinder!"), CM was not noticeably restricted. The officers never physically restrained, raised their voices to, or otherwise attempted to intimidate CM, and Agent Ossinger testified that CM went in and out of his RV while Det. Tupper and Agent Kelly were talking with Mr. Mumme. On these facts, it is not clear why Mr. Mumme would have understood the officers' interactions with his father to mean that he was not himself free to leave or that he otherwise had to accede to the officers' requests.

As to Mr. Mumme's claim that he became overwhelmed when Det. Tupper refused to allow him to enter the house to call his lawyer, I do not find Det. Tupper's

conduct coercive. Det. Tupper made clear to Mr. Mumme that the reason he was not allowed into his home was that the officers intended to secure the house while they applied for a warrant. This was a lawful step. *See supra*, note 4. Moreover, Mr. Mumme was never told that he could not use a cell phone or leave the premises to place a call to his lawyer. Taking into account the totality of the circumstances, I find that Mr. Mumme's consent to the seizure of his devices was voluntary.

## II. Trespassory Searches

Mr. Mumme argues that Det. Tupper and Agent Kelly remained on CM's property to question Mr. Mumme even after CM told Agent Kelly and Agent Ossinger that the officers needed a warrant to be there. According to Mr. Mumme, the officers should have taken CM's statement that they needed a warrant to be on the property as an indication that they were trespassing. By remaining on the property thereafter, Mr. Mumme claims, the officers engaged in a trespass and their interview with Mr. Mumme should be seen as a violation of the Fourth Amendment under *United States v. Jones*, 565 U.S. 400 (2012).

Through *Jones* and *Florida v. Jardines*, 569 U.S. 1 (2013), the Supreme Court revitalized the trespass-based analysis of searches under the Fourth Amendment that prevailed before *Katz v. United States*, 389 U.S. 347 (1967). Under that analysis, a Fourth Amendment search has occurred when the government engaged in a trespass for the purposes of obtaining information. *Jones*, 565 U.S. at 404.

While Mr. Mumme's argument, which casts a consensual conversation as an unconstitutional search, touches on interesting legal issues, I need not decide them. The Fourth Amendment is not concerned with just "any technical trespass that led to

11

the gathering of evidence." *Jones*, 565 U.S. at 411 n.8. To implicate the Fourth Amendment, the trespass must invade a constitutionally protected area—that is, individuals' "persons, houses, papers, and effects." *Id.* Crucially here, as the Supreme Court reemphasized in both *Jones* and *Jardines*, while the Constitution protects houses and certain areas connected to houses (in legal parlance, the "curtilage"), that protection does not extend to "open fields" even if they are adjacent to a home. *Jardines*, 569 U.S. at 6 ("The Fourth Amendment does not, therefore, prevent all investigations conducted on private property; for example, an officer may (subject to Katz) gather information in what we have called 'open fields'—even if those fields are privately owned."); *Jones* 565 U.S. at 411 ("[A]n open field, unlike the curtilage of a home, is not one of those protected areas enumerated in the Fourth Amendment. The Government's physical intrusion on such an area—unlike its intrusion on the 'effect' at issue here [*i.e.*, the Defendant's car]—is of no Fourth Amendment significance.").

At the hearing on Mr. Mumme's motion to suppress, counsel for Mr. Mumme conceded that Mr. Mumme's conversations with Det. Tupper and Agent Kelly took place outside of the curtilage of Mr. Mumme's (or CM's) home. Because the claimed intrusion did not reach into a constitutionally protected area, any "trespass" did not give rise to an impermissible search for purposes of the Fourth Amendment. Mr. Mumme's novel argument therefore fails out of the gate.

### III. Custodial Interrogation

Finally, I consider Mr. Mumme's argument that he was in custody during Det. Tupper's questioning and that his statements and the fruits of those statements must be suppressed. " '[A] person questioned by law enforcement officers after being taken

12

into custody or otherwise deprived of his freedom of action in any significant way must first' receive Miranda warnings." *United States v. Mittel-Carey*, 493 F.3d 36, 39 (1st Cir. 2007) (alteration in original) (*quoting Stansbury v. California*, 511 U.S. 318, 322 (1994)). To determine whether an individual was in custody at the time of questioning, courts evaluate "whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Id.* In making this assessment courts consider whether, under the totality of the circumstances, "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Id.*

The First Circuit has identified a non-exhaustive list of four factors to be considered when evaluating whether a suspect was in custody, including "whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation." *Id.* (quoting *United States v. Masse*, 816 F.2d 805, 809 (1st Cir. 1987)). "[W]hether custody exists 'depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.' " *United States v. Hughes*, 640 F.3d 428, 435 (1st Cir. 2011) (quoting *Stansbury*, 511 U.S. at 323).

In support of his argument that he was in custody while Det. Tupper and Agent Kelly questioned him, Mr. Mumme points to substantially the same facts upon which he rests his voluntariness argument.

13

I find that the totality of the circumstances suggests that Mr. Mumme was not in custody at the time that he was questioned. The interview took place in the familiar surroundings of the yard of Mr. Mumme's home. While four law enforcement personnel were present, only two officers spoke to Mr. Mumme. The interrogation was fairly brief, lasting 45 minutes, and the recording of the encounter reflects that the entire interaction was calm and conversational. *Hughes*, 640 F.3d at 437 (finding that the relaxed, non-confrontational atmosphere and "relatively short duration" of defendant's 90-minute interview were "consistent with the [district court's] finding that the interview was not custodial"). The officers were dressed in civilian clothes, and, while all of them were armed, only Det. Tupper carried an exposed weapon. Mr. Mumme was never physically restrained, and the officers never drew their weapons or otherwise threatened or attempted to intimidate him. The officers did not inform Mr. Mumme that he was free to leave, but they also never told him he could not do so.

Mr. Mumme emphasizes that he could see SAs Kelly and Ossinger restricting his father's movements and could hear Det. Tupper tell CM not to hinder the investigation. From this, Mr. Mumme argues, he would have understood that he also was not free to go. I have already found that the record does not bear out this characterization of the events.

Mr. Mumme also asserts that Det. Tupper restricted his movement by telling him that he could not enter the house to call his attorney. While Mr. Mumme is correct that Det. Tupper limited Mr. Mumme's ability to go into his house, that is not

14

the test here: Det. Tupper did nothing to suggest that Mr. Mumme could not cease his conversation with the police and go elsewhere. Indeed, the recording and Det. Tupper's testimony suggest that after telling Mr. Mumme that he could not go into his home, Det. Tupper attempted to disengage from his conversation with Mr. Mumme. In light of the foregoing, I find that a reasonable person would have felt free to end the interrogation and leave. Accordingly, Mr. Mumme was not in custody at the time that he was questioned and his Fifth Amendment rights were not implicated by Det. Tupper or Agent Kelly's questioning.

## CONCLUSION

For the reasons stated above, the Court **DENIES** the Defendant's motion to suppress.

SO ORDERED.

/s Nancy Torresen

United States Chief District Judge

Dated this 6th day of June, 2018